**Affirmed in Part as Modified, Reversed and Rendered in Part, and Opinion filed April 14, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00739-CV

## ALTA MESA HOLDINGS, L.P., ALTA MESA ACQUISITION SUB, LLC, THE MERIDIAN RESOURCE & EXPLORATION LLC CHANGE IN CONTROL SEVERANCE PLAN, AND THE MERIDIAN RESOURCE & EXPLORATION, LLC, Appellants

## V.

## STEVEN IVES AND LLOYD DELANO, Appellees

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Cause No. 2011-06887

# O P I N I O N

Appellees, Steven Ives and Lloyd Delano, sued appellants, Alta Mesa Holdings, L.P. (Holdings), Alta Mesa Acquisition Sub, LLC (Acquisition Sub), The Meridian Resource & Exploration LLC Change in Control Severance Plan (the Severance Plan), and The Meridian Resource & Exploration, LLC (TMRX), for breach of their

employment agreements as well as claims under the Employee Retirement Income Security Act (ERISA).[1]  Appellees sought severance benefits under both their employment agreements and the Severance Plan.  After a bifurcated trial in which the employment agreement claims were tried to a jury and the ERISA claims were tried to the bench, the trial court rendered judgment awarding appellees damages on both the breach of contract and ERISA claims.  In three issues and multiple sub-issues, appellants contend that the trial court erred in awarding appellees damages under the Severance Plan, damages under the employment agreements, and attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code.  We affirm in part and reverse and render in part.

## I.  Background

In 2010, appellees were officers and employees of TMRX, which at the time was a subsidiary of The Meridian Resource Corporation (Meridian).  Appellees both entered employment agreements with TMRX and were covered by the Severance Plan.  In May 2010, Meridian merged into Acquisition Sub, which was itself a subsidiary of Holdings created for purposes of the merger.[2]

Both the employment agreements and the Severance Plan permitted appellees to resign for "Good Reason" and thereafter receive severance benefits.  Both men tendered their resignations on February 1, 2011, citing Good Reason for doing so.  They subsequently asserted that their job responsibilities had been significantly reduced post-merger, which they contend constituted Good Reason for the resignations under both the

---

[1] 29 U.S.C. §§ 1001–1461.

[2] Employee-friendly severance plans and employment agreements, such as the ones at issue in this case, are often used by companies anticipating a change in control in order to retain key executives during the uncertainty of a potential merger or acquisition.  Such agreements are commonly referred to as "golden parachutes."  *See Elloway v. Pate*, 238 S.W.3d 882, 887 n.1 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Greathouse v. Glidden Co.*, 40 S.W.3d 560, 566 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Severance Plan and the employment agreements. Appellees filed the present lawsuit on the same day that they tendered their resignations. Appellants to date have not paid appellees benefits under either the Severance Plan or the employment agreements.

By its terms, the Severance Plan is administered by a committee, which was defined to consist of Joseph Reeves, Meridian's founder and one-time chief executive officer, and Michael Mayell, Meridian's president and chief operating officer. The plan further provided that upon a "Change in Control," defined so as to include a merger, the committee would include "such individuals as may be appointed by Joseph Reeves and Michael Mayell." It is undisputed that at no point have Reeves and Mayell appointed anyone else to be on the committee.

Post-merger, TMRX attempted to appoint its new manager, Harlan Chappelle, as the sole member of the committee. TMRX further attempted to adopt a series of three amendments to the plan documents. The validity of Chappelle's appointment and the three amendments was a principal dispute below and continues to be so in this appeal.

The first amendment, made at the same time as Chappelle's appointment and executed by him as TMRX's manager, redefined committee to mean "one or more individuals as may be appointed by the Board of Managers of TMRX to serve as the Committee until such time as removed or replaced by the Board of Managers of TMRX in its discretion." The second amendment, purportedly authorized by Chappelle as the sole member of the new committee, prohibited employees from recovering severance benefits under both the plan and an employment agreement.[3] The third amendment added claim procedures that included a requirement that a claimant must file a claim within six months for any benefits he or she contends were not provided in accordance

---

[3] The second amendment specifically stated that

in the event that a Participant is eligible to receive payments and benefits under both (i) this Plan and (ii) any other severance or change-of-control plan, program, contract, or agreement . . . then any monetary benefits provided under this Plan will be reduced and offset by the monetary benefits due and payable from the Other Source.

3

with the plan, as well as review and appeal procedures. Prior to trial, the trial court granted appellees summary judgment, finding the three amendments void, as they were not passed in accordance with the amendment procedures in the plan documents.

After the trial court's summary judgment rulings, Holdings sent letters to Reeves and Mayell, requesting that they either (1) ratify the three amendments, (2) "issue a Plan determination [regarding appellees' claims] as the committee," or (3) appoint Holdings as the new committee. At no point, however, did appellants actually file a challenge with Reeves and Mayell or submit any evidence for their review. Reeves and Mayell declined to ratify the amendments or name any successors to the committee. Appellants subsequently requested that the trial court appoint a new, temporary committee to consider appellees' claims, which the trial court denied.

Trial proceeded to a jury on the breach of the employment agreements and to the bench on the claims for severance benefits under the plan. The jury found that TMRX, Acquisition Sub, and Holdings failed to comply with appellees' employment agreements and such failures were not excused by waiver or ratification. The jury further found Ives was entitled to $276,719 in damages for the breach, and Delano was entitled to $422,579. The jury also calculated the amount of attorney's fees incurred by each appellee in prosecuting the claims.

Regarding claims under the Severance Plan, the trial court entered detailed findings of fact, including that the Severance Plan, by its terms, created a presumption in favor of appellees' assertion of Good Reason for their resignations and at no point did TMRX file a claim or any evidence with the committee purporting to challenge that appellees had Good Reason to resign.[4] In its conclusions of law, the trial court stated

---

[4] In its definitional section, the plan states: "For purposes of any determination regarding the existence of Good Reason, any claim by the [appellees] that Good Reason exists shall be presumed to be correct unless the Company establishes to the Committee by clear and convincing evidence that Good Reason does not exist."

among other things that appellees "had no obligation under the Severance Plan to engage in any administrative process beyond the assertion that Good Reason existed"; the burden of exhausting available administrative remedies was on TMRX, and if TMRX wanted to challenge the claim of Good Reason, it needed to do so before the 30-day "payment deadline" had passed; and when TMRX failed to take any action to challenge appellees' assertion of Good Reason, the presumption favoring appellees became conclusive. The trial court further concluded that it was without authority to replace Reeves and Mayell with a new, temporary committee. The trial court additionally determined that TMRX and the Severance Plan owed Ives $267,188.58 and DeLano $399,967.12 on their ERISA claims and awarded appellees their attorney's fees expended in pursuing the ERISA claims.

In its final judgment, the trial court assessed damages and attorney's fees in keeping with the verdict and the findings of fact and conclusions of law, except that the court did not award attorney's fees on the breach of contract cause of action against Holdings, apparently based on our opinion in *Fleming & Associates, L.L.P. v. Barton*, 425 S.W.3d 560, 574-75 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (holding that attorney's fees are not available in a breach of contract cause of action against a partnership under Texas Civil Practice and Remedies Code section 38.001(8)).

## II. ERISA Claims

In their first issue, appellants contend the trial court erred in awarding appellees benefits under the Severance Plan. Specifically, appellants contend that the court improperly (1) struck the three plan amendments as void, (2) rewrote the plan to impose a 30-day deadline on TMRX to challenge appellees' claims, and (3) refused to appoint a new, temporary committee to consider appellees' claims rather than awarding benefits. We will begin by addressing the propriety of the three amendments and then will turn to the 30-day deadline and proposed temporary committee.

5

## A. The Three Amendments

The trial court struck all three attempted plan amendments as not properly adopted in accordance with the terms of the plan. Under ERISA, severance plans must provide procedures for amendment and these procedures must be followed for amendments to be effective. *See* 29 U.S.C. § 1102(b)(3); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 75 (1995); *see also Depenbrock v. Cigna Corp.*, 389 F.3d 78, 82 (3rd Cir. 2004) ("[A]n amendment is ineffective if it is inconsistent with the governing instruments."); *Confer v. Custom Eng'g*, 952 F.2d 41, 43 (3rd Cir. 1991) ("Only a formal written amendment, executed in accordance with the Plan's own procedure for amendment, could change the Plan.").[5] The Severance Plan in the present case required amendments to be "by a written instrument that is authorized by the committee." Appellants do not dispute that the committee of Reeves and Mayell declined to adopt the proposed amendments. The real dispute then is whether TMRX had authority under the plan to change the makeup of the committee post-merger, thus allowing the new committee to enact the amendments.

Section 2.1 of the plan defines the committee to mean "prior to a Change in Control [i.e., in this case, the merger], Joseph Reeves and Michael Mayell" and "after a Change in Control, . . . such individuals as may be appointed by Joseph Reeves and Michael Mayell." Appellees argue that since it is undisputed that Reeves and Mayell neither approved of the three amendments nor appointed anyone else to the committee who could have approved the amendments, the attempted amendments were void. We agree.

In support of their position that TMRX retained authority to appoint a new

---

[5] Because ERISA is a federal statute, we are bound by the precedents of the United States Supreme Court and give strong consideration to opinions of the federal appellate courts. *Sharp v. Caterpillar, Inc.*, 932 S.W.2d 230, 235 (Tex. App.—Austin 1996, writ denied*); see also Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993).

committee, appellants point to section 10(b) of the Severance Plan which provides that "the power to appoint the Committee . . . shall be exercised by TMRX." Based on this language, appellants contend that TMRX could appoint new committee members when Reeves and Mayell failed to do so. They further assert that in holding otherwise, the trial court rendered section 10(b) meaningless, citing *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004) ("We construe contracts as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").

Article 10, entitled "Adoption of Plan by Affiliates," concerns the possible adoption of the Severance Plan by entities affiliated with TMRX. Section 10(a) permits such affiliates to adopt the plan. Section 10(c) states that, for ERISA purposes, the plan when adopted by affiliates shall still constitute a single plan rather than a separate plan for each affiliate. Section 10(b), the one relied upon by appellants, states in full: "The provisions of the Plan shall apply separately and equally to each adopting Affiliate in the same manner as is expressly provided for the Company, except that the power to appoint the Committee and the power to amend or terminate the Plan shall be exercised by TMRX."

Appellants do not dispute that the only way provided in the plan for TMRX to amend the plan was by "a written instrument that is authorized by the Committee," as provided in article IX; however, they nonetheless contend section 10(b) permits TMRX to change the makeup of the committee. We disagree with appellants' construction. The plan contains no suggestion that TMRX could change the membership of the committee after a merger other than as expressly provided, through the actions of Reeves and Mayell. Just as TMRX could act only through the committee to enact any plan amendments, it could act only through Reeves and Mayell to name a new committee post-merger. Section 10(b) does not change this.

The better reading of section 10(b) is that it prevents "adopting affiliates" from

amending the plan or appointing a new or different committee. Section 10(b) has no application to the situation here, where there has been a merger rather than an adoption by an affiliate; this is highlighted by the fact the plan already provides specific instructions regarding the makeup of the committee after a merger. *See McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 731-32 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd) ("One general rule of construction is that when there is a conflict between two provisions, the specific provision controls over the general provision.").[6] Appellants complaints about the attempted plan amendments are without merit. Because TMRX was without authority to amend the plan, the trial court properly struck the attempted amendments as void. *See* 29 U.S.C. § 1102(b)(3); *Schoonejongen*, 514 U.S. at 75; *Confer*, 952 F.2d at 43.

## B. 30-Day Deadline & New Temporary Committee

Appellants next contend that even assuming the amendments were not valid, the trial court erred in (1) implying a 30-day deadline for TMRX to contest appellees' benefits claims and (2) refusing to appoint a new temporary committee for the purpose of determining appellees' rights to benefits. In discussing these contentions, it is important to note findings that appellants do not dispute. While appellants argue that the trial court erred in holding that TMRX waived any contest to appellees' assertion of

---

[6] Appellants further argue that if TMRX did not have the authority to appoint new committee members, the plan would have been left in the impossible situation of having no active committee when Reeves and Mayell failed to appoint successors post-merger. Appellants suggest that this would have caused TMRX to breach its fiduciary duty as plan administrator. These arguments, however, are speculative, incomplete, and multifarious. Except to the extent that they are repeated in appellants' argument that the trial court should have appointed a new, temporary committee to consider appellees' benefits claims, we decline to address the merits of these contentions. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Jones v. Villages of Town Ctr. Owner's Ass'n*, No. 14-12-00306-CV, 2013 WL 2456873, at *6 (Tex. App.—Houston [14th Dist.] June 6, 2013, pet. denied) ("If the appellate court concludes that a point of error is multifarious, it may refuse to review or it may consider the point of error if it can determine with reasonable certainty the error about which complaint is made."); *In re A.R.*, 236 S.W.3d 460, 477 (Tex. App.—Dallas Oct. 19, 2007, no pet.) (mem. op.) (holding that issue could not be considered because it was multifarious and inadequately briefed).

Good Reason by not submitting such contest to the committee within 30 days, appellants do not dispute that (1) appellees asserted Good Reason for resigning in their resignation letters and (2) TMRX *never* submitted a claim or took any other action with the Reeves and Mayell committee contesting appellees' assertion of Good Reason.[7] As will be explained, these other findings, fully supported by the record, render the trial court's finding of a 30-day deadline irrelevant.[8] Additionally, appellees have shown no grounds requiring appointment of a new, temporary committee by the trial court.

Under article II of the unamended plan, any claim of Good Reason by a participant "shall be presumed to be correct unless the Company establishes to the Committee by clear and convincing evidence that Good Reason does not exist."[9] Thus, as the trial court concluded, once appellees submitted their resignation letters citing Good Reason and seeking benefits, the burden shifted to TMRX to dispute those claims with the committee. On the same day that he received appellees' letters, Chappelle, TMRX's manager, replied in letter form, stating that he accepted their resignations but

---

[7] Appellants, of course, contend that TMRX validly changed the makeup of the committee and disputed appellees' claims for benefits with the newly installed committee. As detailed in the prior section of this opinion, however, TMRX's attempt to change the makeup of the committee was ineffective. Appellants do not dispute that they never submitted a claim or took any other action with the Reeves and Mayell committee contesting appellees' assertion of Good Reason.

[8] Unchallenged findings of fact are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). However, even if appellants had challenged these findings, they were supported by legally and factually sufficient evidence, as presented below. *See generally City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (addressing standards of review for legal sufficiency of the evidence); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (standards of review for factual sufficiency).

[9] Article II additionally states that in a claim of Good Reason, "any position taken by the Participant shall be presumed to be correct unless the Company establishes to the Committee by clear and convincing evidence that such position is not correct." As set forth above, in its findings of fact and conclusions of law, the trial court noted that under the plan, a presumption was created that favored appellees "declaration of resignation for Good Reason," appellees had no obligation to engage in any administrative process beyond their assertion that Good Reason existed, and TMRX carried the burden of exhausting any administrative process. The court additionally concluded that because TMRX failed to take any action to challenge the assertion of Good Reason, the plan's presumption was conclusive.

also that "the Company reserves its right to invoke any relevant section under [the] Plan, including the separation for cause provisions." Appellants, however, do not assert that TMRX ever followed up by contesting the assertion of Good Reason with the committee of Reeves and Mayell.

The record further supports the conclusion that TMRX never submitted a claim or took any other action with the Reeves and Mayell committee contesting appellees' assertion of Good Reason. As discussed above, in November 2013, Holdings sent a letter to Reeves and Mayell requesting that they either (1) ratify the three amendments, (2) "issue a Plan determination as the committee," or (3) appoint Holdings as the new committee. This letter does not constitute a challenge by TMRX to appellees' assertion of Good Reason for several reasons, including that (1) it was on behalf of Holdings and not TMRX; (2) although it asked, as one alternative, that Reeves and Mayell make a determination under the plan, it does not actually challenge appellees' assertion of Good Reason in any manner or suggest what determination the committee should make; and (3) it contains an offer to send "an administrative record" only if Reeves and Mayell decided to issue a determination. In response, Reeves and Mayell declined to take any of the proposed actions; however, such response did not convert the letter into a challenge to appellees' claims for benefits. Appellants do not cite any other evidence that they contested appellees' assertion of Good Reason.[10] As the trial court found, under the terms of the Severance Plan, because TMRX failed to establish the contrary with the committee by clear and convincing evidence, appellees' assertion of Good Reason for resigning was presumed correct.[11] The record supports this conclusion

---

[10] Prior to the trial court's summary judgment ruling, which determined the three attempted amendments were invalid, appellants apparently had operated under the assumption that the amendments were valid. Under the proposed amendments, TMRX was not required to contest appellees' benefits claims with the committee of Reeves and Mayell and, thus, they had not done so.

[11] As the trial court stated: "Because TMRX failed to file any claim or otherwise take any action with the Committee challenging the Plaintiff's Good Reason, the Severance Plan's presumption that Plaintiffs' resigned for Good Reason is conclusive."

regardless of the trial court's additional finding that if TMRX had wanted to contest the assertion of Good Reason, it needed to do so within 30 days. Therefore, appellants' challenge to that finding is irrelevant. *See, e.g., Norred v. Hartsfield*, 360 S.W.3d 583, 586-87 (Tex. App.—Dallas 2011, no pet.) (disregarding challenge to trial court's finding where finding had no effect on the judgment); *Cooke Cty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.) (same).

Appellants additionally assert, however, that filing a challenge with the committee of Reeves and Mayell would have been futile because the pair had exhibited an unwillingness to act as the committee. On that basis, appellants argue that the trial court should have appointed a new, temporary committee to consider whether appellees were entitled to benefits, and they request that this court remand the case back to the trial court with instructions to appoint a new, temporary committee. While courts applying ERISA have recognized the possibility that seeking recourse with the appropriate administrative body under a plan might become futile under certain circumstances, the remedy provided in such cases is not court appointment of a new administrative body, but an ability to seek redress in court without having first exhausted the administrative process. *See, e.g., Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 232 (5th Cir. 1997); *B & S Welding LLC Work Related Injury Plan v. Oliva-Barron*, 447 S.W.3d 425, 429 (Tex. App.—Dallas 2014, no pet.). Thus, appellants' ERISA-based arguments that they were, and are, entitled to appointment of a new, temporary committee are not well-founded.[12] Appellants exercised the remedy to which

---

[12] Appellants additionally argue that without a determination by the committee, there is nothing for this court to review under the appropriate "arbitrary and capricious" standard because appellees failed to exhaust the available administrative remedies. *See generally Napoli v. Johnson & Johnson, Inc.*, 624 Fed. App'x 861, 863 (5th Cir. 2015) (explaining that when an ERISA plan administrator is given discretionary authority, its decisions within the scope of that authority should be overturned if the administrator acted arbitrarily or capriciously); *Bourgeois v. Pension Plan for the Emp'ees of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000) (discussing requirement that a claimant exhaust available administrative remedies before bringing suit for benefits). However, it was TMRX that failed to exhaust its available administrative remedies, not appellees. The trial court determined that

they were entitled—they got their day in court.

Appellants do not offer any other authority supporting the creation of a new temporary committee under similar circumstances. Appellants chiefly cite cases in which appellate courts have sent ERISA disputes back to plan administrators because a benefits decision was not made according to proper procedures, but none of the cited cases remotely involved a situation such as this, in which the employer failed to contest a presumption favoring the claimant, nor did they involve appointment of new plan administrators. *See Shelton v. ContiGroup Cos.*, 285 F.3d 640, 643-44 (8th Cir. 2002) (ordering remand to plan administrator for decision on the merits where employer rather than administrator had previously removed claimant from plan); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 594-98 (6th Cir. 2001) (affirming remand to plan administrator because decision to revoke claimant's benefits had originally been made by employer rather than by authorized body). Because none of appellants' arguments concerning the award of benefits under the Severance Plan have merit, we overrule their first issue.

### III. Employment Agreement Claims

Under their second issue, appellants raise two arguments related to the award of damages to appellees based on alleged breaches of their employment agreements. The jury found that TMRX, Acquisition Sub, and Holdings all failed to comply with the two agreements, and the trial court awarded damages against those entities in keeping with the jury's findings. Appellants first assert that, as a nonsignatory to the agreements, Holdings cannot be held liable for breach of those agreements. Second, appellants

---

appellees did everything administratively required of them under the plan when they filed resignation letters citing Good Reason, and this conclusion is supported by the plan documents themselves. *See generally Hall*, 105 F.3d at 231 (explaining that a trial court's decision regarding exhaustion is reviewed under an abuse of discretion standard). Under the plan, this created a presumption in appellees' favor unless and until TMRX challenged the assertion of Good Reason by filing evidence with the committee, something TMRX has never done.

12

contend the trial court erred in rejecting their proposed jury instruction that would have excluded Holdings as part of "the Company" as that term is used in the employment agreements. Appellants request a remand for a new trial on the issue of liability under the employment agreements.

### A. Alta Mesa Holdings' Liability

Appellants contend that Holdings cannot be held liable for breach of the employment agreements because it was neither a party to the agreements nor was it bound by them post-merger. We agree.

Among other elements, a plaintiff in a breach of contract cause of action must prove that a valid contract existed between the plaintiff and the defendant. *E.g., West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In other words, the plaintiff must show that the defendant has obligated itself under the contract. *E.g., Interstate Inv. Corp. v. Rillo*, No. 01-03-00818-CV, 2005 WL 267663, at *3 (Tex. App.—Houston [1st Dist.] Feb. 3, 2005, no pet.); *Miles v. Plumbing Servs. of Houston, Inc.*, 668 S.W.2d 509, 512 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *see also Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind."). The only signatories to the employment agreements at issue in this case were appellees and TMRX.

Although at the time the agreements were executed, TMRX was a subsidiary of Meridian and Meridian and all of its subsidiaries were subsequently merged into Acquisition Sub which was itself a subsidiary of Holdings, the mere existence of a corporate relationship between Holdings and TMRX is not enough to make Holdings liable on TMRX's contracts. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) ("[C]orporate affiliates are generally created to separate the businesses, liabilities, and contracts of each. Thus, a contract with one corporation . . . is generally

13

not a contract with any other corporate affiliates."). Courts generally will not disregard the corporate fiction and hold a parent corporation liable for the obligations of a subsidiary unless something more is presented, such as evidence supporting an agency relationship or grounds for piercing the corporate veil. *See, e.g., Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374-75 (Tex. 1984) (discussing circumstances under which corporate fiction may be disregarded in order to hold parent liable for obligations of subsidiary whether contractual or tortious in nature); *see also Hanson Sw. Corp. v. Dal-Mac Constr. Co.*, 554 S.W.2d 712, 716-19 (Tex. App.—Dallas 1977, writ ref'd n.r.e.) (holding plaintiff failed to establish liability of parent corporation under alter ego or agency theories for construction contract entered into with subsidiary, even though parent guaranteed purchase money loan for shopping center site, controlled flow of funds to subsidiary, and owned all of subsidiary's stock, and representations were made that parent or related companies owned the shopping center). Here, appellees did not plead, attempt to prove, or argue any theory of piercing the corporate veil or agency. *See In re Merrill Lynch*, 235 S.W.3d at 191 (declining to disregard corporate structure where plaintiffs made no allegations supporting that outcome).

Instead, appellees point to section 4.8 of the employment agreements as imposing liability for breach on Holdings. Section 4.8 states that: "For the purposes of this Agreement, Company shall include any parent, subsidiary division of the Company, or any entity, which directly or indirectly, controls, is controlled by, or is under common control with the Company." Although this statement clearly encompassed Meridian at the time of execution and arguably encompassed Holdings post-merger (see discussion below), the fact remains that the only signatory defendant was TMRX and, as stated, appellees did not press any theory to pierce the corporate veil or establish an agency relationship. The beginning of each of the employment agreements states that the agreement is between TMRX and the respective employee, Ives or Delano. The term "Company" is elsewhere used in the agreements to specify various rights and

14

obligations, including who the employer was, who pays the salaries, who can terminate the agreements, and who has to pay benefits upon termination by the employee for Good Reason. However, just because the contract states that a nonparty to the contract is required to pay under the contract doesn't make that party liable. *See In re Merrill Lynch*, 235 S.W.3d at 191; *Lucas*, 696 S.W.2d at 374-75. Neither Meridian nor Holdings made any promises in the employment agreements; they were not parties to those agreements.

Appellees additionally argue that in the merger, Holdings, through Acquisition Sub, obtained the assets and liabilities of TMRX, which would include liabilities to appellees under their employment agreements. This conclusion, however, is contrary to the express terms of the merger agreement. Section 2.1 of the merger agreement states that

> [u]pon the terms and subject to the conditions hereof, at the Effective Time, Target [Meridian] shall merge with and into Merger Sub [Acquisition Sub] and the separate corporate existence of Target shall thereupon cease and Merger Sub shall be the surviving company in the Merger (sometimes referred to herein as the "Surviving Company"). The Merger shall have the effects set forth in . . . Section 10.008 of the [Texas Business Organizations Code], ***including the Surviving Company's succession to and assumption of all rights and obligations of Target***.[13]

---

[13] Section 10.008 of the Organizations Code concerns the consequences of a merger; among other things, it provides that "all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger." Tex. Bus. Org. Code § 10.008(a)(3). Additionally,

> each surviving or new domestic organization to which a liability or obligation is allocated under the plan of merger is the primary obligor for the liability or obligation, and, except as otherwise provided by the plan of merger or by law or contract, no other party to the merger, other than a surviving domestic entity or non-code organization liable or otherwise obligated at the time of the merger, and no other new domestic entity or non-code organization created under the plan of merger is liable for the debt or other obligation.

*Id*. § 10.008(a)(4). The merger agreement clearly states that Acquisition Sub, as the "Surviving Company," succeeded to TMRX's obligations under the employment agreements, a reading reemphasized by the agreements reference to section 10.008.

15

Thus, while Holdings signed the merger agreement and was the sole owner of the shares of Acquisition Sub, the merger agreement specified that Acquisition Sub assumed the obligations of Meridian and its subsidiaries (including TMRX), not Holdings.[14]

Lastly, appellees cite the following exchange during the testimony of Harlan Chappelle who, in addition to being manager of TMRX, was CEO of Holdings and Acquisition Sub:

> Q. Sure. Okay. So, I understand so what you are saying Alta Mesa Acquisition Sub Company acquired the obligations under my clients' employment agreement [sic]?
>
> A. It did.
>
> Q. And you're contending, though, I think by your explanation that Alta Mesa Holdings, L.P., did not in your opinion acquire those?
>
> A. No. I wouldn't suggest that at all. I was just suggesting that it flowed through Alta Mesa Acquisition Sub's obligation of that subsidiary.
>
> Q. Well, I understand the flow-through portion. Let me ask the ultimate question: Do you believe—just your opinion—that Alta Mesa Holdings, L.P., has a contractual obligation under my clients' employment agreements?
>
> A. I believe we have a responsibility to make sure that employment agreement is upheld.

Appellees assert that this excerpt demonstrates that Holdings was in fact liable for breach of the employment agreements because its CEO acknowledged such responsibility. Appellants, on the other hand, suggest that Chappelle was just "acting like any good CEO" in recognizing that he had a responsibility to ensure all of the companies under his umbrella honored their contractual obligations. However,

---

[14] This conclusion is also supported by the employment agreements themselves, which provide in section 4.4 that "[i]f the Company shall at any time be merged or consolidated into or with any other entity, the provisions of this Agreement shall survive any such transaction and shall be binding on and inure to the benefit and responsibility *of the entity resulting from such merger* or consolidation." (Emphasis added.) As discussed, Acquisition Sub was the entity resulting from the merger, not Holdings.

regardless of which interpretation of the testimony is correct, parol evidence such as this cannot be used to contradict the unambiguous terms of the merger agreement. *See Saba Zi Expl., L.P. v. Vaughn*, 448 S.W.3d 123, 131 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Where the parties have entered into an unambiguous written contract, the instrument alone will be deemed to express the intention of the parties because it is the objective intent, not subjective intent, that controls. . . . An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). Likewise, this brief, imprecise testimony does not make Holdings liable for the employment agreements when it was not a party to those agreements, and appellees have not raised any theory to make Alta Mesa Holdings liable for breach as a nonparty. *See In re Merrill Lynch*, 235 S.W.3d at 191; *Lucas*, 696 S.W.2d at 374-75. Accordingly, the trial court erred in awarding appellees breach of contract damages against Holdings. We therefore sustain appellants' second issue to the extent that it concerns Holdings' liability.[15]

## B. Defining "Company"

Also under issue two, appellants contend that the trial court erred in refusing to instruct the jury that Holdings should not be considered as part of the Company as that term was used in the employment agreements. During the charge conference, appellants specifically requested the following instruction or definition be included in the charge: "'The Company' means The Meridian Resource & Exploration LLC (also referred to as 'TMRX') and Alta Mesa Acquisition Sub, LLC." Appellants essentially urged the trial court to rule as a matter of law that Holdings was not included in the definition of Company in section 4.8 of the employment agreements discussed above. *See generally City of Keller v. Wilson*, 168 S.W.3d 802, 814-15 (Tex. 2005) (discussing standards of

---

[15] The appropriate appellate remedy for this error will be discussed at the conclusion of the analysis of appellants' second issue.

review in matter of law challenges). The trial judge refused the definition and submitted TMRX and Acquisition Sub on one line and Holdings on a separate line for answers to the liability questions.

The importance of this issue extends beyond whether Holdings could be held liable for breach of the agreements. As we held above, as a nonsignatory, Holdings could not be held liable for breach absent pleading or proof of some other theory of liability. Appellants' argument here additionally addresses whether TMRX and Acquisition Sub could be held liable for actions or situations involving Holdings.

Appellants explain that the requested definition was necessary because it addresses whether TMRX and Acquisition Sub had a contractual responsibility to ensure that appellees were made officers of Holdings. Appellants argue that while, pre-merger, Meridian may have been included under the definition of "Company" in section 4.8 as TMRX's parent company, post-merger, it was Acquisition Sub which stepped into Meridian's place, not Holdings, which was further removed as a parent of Acquisition Sub. Appellants allege that without the requested definition, the charge permitted the jury to find a breach occurred because appellees were not made officers of Holdings—conduct that appellants contend did not fall within the scope of the employment agreements.[16]

---

[16] The employment agreements permitted appellees to terminate the agreements and receive benefits for Good Reason if they were removed from their executive positions. According to appellants, the guaranteed positions were within TMRX and Acquisition Sub and appellees were not entitled to receive positions within Holdings. As appellants state it: "the employment agreements were drafted to ensure that [appellees] never received a demotion in rank or responsibility—not to guarantee them promotions to more prominent positions within larger organizations."

Appellees argue that under the employment agreements, they were entitled to be named (and have the corresponding duties and responsibilities of) officers of Holdings, as they had been officers of Meridian and not just TMRX before the merger. Appellees further contend it was Holdings that diminished their job duties by reassigning those duties to other subsidiaries. Appellees also assert that the evidence demonstrated TMRX and Acquisition Sub breached the contract in other ways as well. We need not determine whether the evidence favors one side or the other on these allegations because we find the trial court did not err in refusing appellants' requested instruction.

Appellants correctly point out that section 4.4 of the employment agreements potentially limits who can be held liable for breach of the agreements when it states that "[i]f the Company shall at any time be merged or consolidated into or with any other entity, the provisions of this Agreement shall survive any such transaction and shall be binding on and inure to the benefit and responsibility of the entity resulting from such merger or consolidation." However, despite appellants' emphasis, this section has no apparent application to determining which entities should be included in section 4.8's definition of "Company" post-merger. It certainly does not redefine that term after a merger. Appellants seek to limit the definition of Company in section 4.8 to either TMRX or its immediate parent, Acquisition Sub, but section 4.8 is not so limited. While section 4.8 expressly encompasses a parent organization, it additionally encompasses "any entity, which directly or indirectly controls, is controlled by, or is under common control with the Company." Thus, the question inherently becomes a fact determination as to whether any entity other than TMRX directly or indirectly controlled TMRX or was under common control. This is as true post-merger as it was pre-merger, and appellants cite no provision suggesting otherwise.[17] Moreover, appellants steadfastly refuse to engage the issue as a fact question, insisting, instead, that the issue is merely one of contract interpretation.

We conclude instead that the jury was properly tasked by the trial court with determining whether TMRX and Acquisition Sub should be held liable for actions by Holdings under the employment agreements. The trial court therefore did not err in refusing to instruct the jury that Holdings was excluded as a matter of law from the definition of Company in the agreements.

---

[17] The definition of Company within section 4.8 appears designed to prevent decisions from being made outside of TMRX (or the surviving entity after a merger) that would defeat the benefits and protections afforded the signatory employee. Nothing in section 4.4 changes that design. Section 4.4 only addresses which entity may be held liable post-merger; it does not create a loophole for defeating the purposes of the agreement by permitting actions to be taken by related entities that would otherwise have been breaches of the agreements.

19

The trial court erred in assessing liability for breach of the employment agreements against Holdings but not in assessing that liability against TMRX and Acquisition Sub. Although appellants have requested reversal and remand under their second issue, we are not limited by that request and must render the judgment that the trial court should have rendered. *See* Tex. R. App. P. 43.3; *Garza v. Cantu*, 431 S.W.3d 96, 108-09 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). The appropriate disposition under these circumstances is to reverse the portion of the judgment assessing breach of contract liability against Holdings and render judgment appellees take nothing against Holdings on those claims.

## IV. Attorney's Fees

In their third issue, appellants contend that the trial court erred in awarding attorney's fees to appellees under Chapter 38 of the Civil Practice and Remedies Code against TMRX and Acquisition for breach of the employment agreements. Under the "American Rule," "litigants may recover attorney's fees only if specifically provided for by statute or contract." *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). Appellees cited Chapter 38 as the sole basis to recover attorney's fees on their claims for breach of the employment agreements. Section 38.001 provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: . . . (8) an oral or written contract." Tex. Civ. Prac. & Rem. Code § 38.001(8). Appellants contend that as limited liability companies, TMRX and Acquisition Sub are excluded from the entities against which attorney's fees may be recovered under section 38.001: individuals and corporations. We agree.

The availability of attorney's fees under a particular statute is a question of law for the court. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999). In construing a statute, our main goal is to determine and give effect to the Legislature's intent. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). To do so,

20

we look primarily to the language of the statute itself, as we consider it "a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999). If a statute defines a term, courts are bound to construe that term by its statutory definition. Tex. Gov't Code § 311.011(b); *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

In our recent opinion in *Fleming & Associates, L.L.P. v. Barton*, we held that under the plain language of section 38.001, a court could not order a partnership (specifically a limited liability partnership) to pay attorney's fees. 425 S.W.3d 560, 574-75 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Appellants contend that the same reasoning that applied to partnerships in that case applies to limited liability companies in the present case. In *Fleming*, we explained that neither "individual" nor "corporation" was defined in the Code Construction Act or Chapter 38, so the ordinary meaning of those terms should be applied in construing section 38.001. *Id*. at 575. We then noted that research did not reveal any definition of "individual" or "corporation" that included any type of partnership, and that the statutory interpretation doctrine "expressio unius est exclusion alterious"—meaning the expression of one concept implies the exclusion of another—suggests the legislature did not intend section 38.001 to apply to partnerships because it did not use any term encompassing partnerships. *Id*.

Applying that analysis to the present case, it appears that the question of whether an LLC is contained within the term "corporation" is a closer call than whether partnership is included within "individual" or "corporation."[18] The additional difficulty lies with the fact "company" and "corporation" are sometimes used synonymously. *See,*

---

[18] In light of our analysis in *Fleming*, appellees do not contend that the term "individual," as used in section 38.001, should be read so as to encompass LLCs. Moreover, neither the dictionary definition of "individual" nor the typical legal usage of the term encompasses legal entities. *See Hoffman v. L&M Arts*, No. 3:10-CV-0953-D, 2015 WL 1000838, at *4-10 (N.D. Tex. Mar. 6, 2015) (mem. op.) (holding section 38.001 does not authorize the recovery of attorney's fees from LLCs).

21

*e.g.*, Black's Law Dictionary 117 (2d Pocket ed. 2001) (defining "company" as "[a] corporation . . . that carries on a commercial or industrial enterprise"); Roget's II: The New Thesaurus 81, 96 (3d ed. 1996) (including "corporation" among the synonyms for "company," and for "corporation," it just says "see company"). That cannot be said for "partnership" and "individual" or "corporation."

However, despite this loose relationship between the common usage of the terms "company" and "corporation," it is clear that as used in Texas statutes, the legal entities identified by the terms "corporation" and "limited liability company" are distinct entities with some but not all of the same features. *See generally SJ Med. Ctr., L.L.C. v. Estahbanati*, 418 S.W.3d 867, 874–75 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("Limited liability companies have been said to offer 'the best of both worlds—the limited liability of a corporation and the favorable tax treatment of a partnership.'") (quoting *Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 429, n.1 (3d Cir. 2012)); *Shook v. Walden*, 368 S.W.3d 604, 613 n.10 (Tex. App.—Austin 2012, pet. denied) ("LLCs are a comparatively recent innovation in business organizational form, in essence affording the corporation-like benefit of limited liability but with partnership tax treatment."). Corporations and LLCs are indeed governed by separate titles within the Business Organizations Code. *See* Tex. Bus. Orgs. Code §§ 20.001-23.110 (Title 2, governing corporations), 101.001-.621 (Title 3, governing LLCs). In other words, the use of one of the terms does not encompass the other type of entity.

Appellees emphasize that under both Texas law and Delaware law—the latter being the law of TMRX's creation—LLCs are treated the same as corporations for certain purposes. *See, e.g.*, Tex. Bus. Orgs. Code § 101.002(a) (providing that specified sections of Title 2 apply to LLCs); *Poore v. Fox Hollow Enters*., No. C.A. 93A-09-0051994 WL 150872, at *2 (Del. Super. Ct. Mar. 29, 1994) (explaining that LLCs afford liability limitations for members and managers similar to those afforded to shareholders and directors of a corporation). However, far from demonstrating that the

term corporation in section 38.001 should be read as encompassing LLCs, these examples reinforce that these are distinct entities; if they were not, there would be no reason to specifically state when they should be treated the same.[19]

The history of section 38.001 and its predecessor statute, article 2226 of the Texas Revised Civil Statutes, further supports the conclusion that use of the term "corporation" does not encompass an LLC. Article 2226 provided that "any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation" could recover attorney's fees against the "persons or corporation." *See Fleming*, 425 S.W.3d at 575. The fact that "corporation" is first used in a list of entities that includes "partnerships" and "other legal entities" indicates that the term was not intended to encompass those other types of entities, because to read the term otherwise would render use of these other terms meaningless. *See, e.g., Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."). Thus, when the term is used again in the same sentence to define against whom attorney's fees could be recovered, it again should not be read as encompassing "partnerships" or "other legal entities" such as LLCs. *See Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) ("[C]ourts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone. In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole. Statutory terms should be interpreted consistently in every part of an act."); *see also Hoffman v. L&M Arts*, No. 3:10-CV-0953-D, 2015 WL 1000838, at *8-9 (N.D.

---

[19] Appellees additionally cite legislative history from the creation of LLCs in which certain facets of LLCs were compared to similar features of corporations (and partnerships). *See* The House Committee on Business and Commerce, Bill Analysis, Tex. H.B. 278, 72nd Leg., R.S. (1991). The mere fact the two legal entities share some similar features does not support the conclusion that the legislature intended for the use of the term "corporation" in section 38.001 to encompass other distinct legal entities such as LLCs.

Tex. Mar. 6, 2015) (mem. op.) (reaching same conclusion). The codification of the provision into section 38.001 was intended to be nonsubstantive in nature; therefore, the entities against whom attorney's fees can be recovered under the section still should not include "other legal entities" such as LLCs. *See Hoffman*, 2015 WL 1000838, at \*8 (reaching same conclusion); *Fleming*, 425 S.W.3d at 575 (addressing nonsubstantive nature of codification).[20]

Lastly, appellees point out that numerous cases have affirmed attorney's fees awards against LLCs; however, it does not appear that the appealing parties argued in any of these cases that section 38.001 did not permit such an award against an LLC. Accordingly, these cases do not stand for the proposition that section 38.001 authorizes recovery of attorney's fees against LLCs. *Cf. Fleming & Assocs.*, 425 S.W.3d at 576 n.17 (pointing out that although several cases have affirmed awards against partnerships, no cases have specifically addressed whether the awards were authorized by section 38.001). Because section 38.001 does not authorize the recovery of attorney's fees in a breach of contract action against an LLC and appellees have not sought attorney's fees for prosecution of that cause of action on any other basis, we sustain appellants' third issue and reverse the award of attorney's fees against TMRX and Acquisition Sub for that cause of action.

## V. Conclusion

Because the trial court erred in assessing liability for breach of the employment agreements against Holdings, we reverse the portion of the judgment assessing breach of contract liability against Holdings and render judgment appellees take nothing against Holdings on those claims. Furthermore, because the trial court erred in awarding

---

[20] Appellees point out that LLCs were not an established form of legal entity either at the time article 2226 was enacted or when it was codified into section 38.001. While accurate, this point does not change the fact that LLCs are not corporations but are "other legal entities" against which section 38.001 does not authorize the recovery of attorney's fees.

attorney's fees on the breach of contract claims against TMRX and Acquisition Sub, we reverse the portion of the judgment awarding such fees. Finding no error in the remainder of the judgment, we affirm the remaining portions.



/s/    Martha Hill Jamison
         Justice


Panel consists of Justices Jamison, McCally, and Wise.